UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
DERRICK McCARTHY,

                   Petitioner,

      -against-

WILLIAM PHILLIPS, Superintendent,

                   Respondent.
-------------------------------------------------X
DEARIE, Chief Judge.

        **MEMORANDUM & ORDER**

        04 CV 3545

Petitioner Derrick McCarthy seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the reasons set forth below, the application is denied, and the petition is dismissed.

### Background

On the night of November 30, 1981, around 9:00 p.m., Maurice Gittens drove petitioner

to Star Wars, a "weed store" on 200th Street and Hollis Avenue in Queens, in a car that

petitioner's brother had stolen. While petitioner was in the store, Gittens, an experienced car

thief, noticed a 1979 model BMW parked up the block in front of 109-69 200th Street. Gittens

approached the car, looked into it, and jimmied the door open using steel keys. He then walked

around the car and opened the passenger side door.

The car belonged to George Spencer, an off-duty U.S. Customs agent. Spencer was

inside Marva Bryan's home at 109-69 200th Street, working with Bryan and Bryan's neighbor

Sylvester Richards to help fix Bryan's boiler. He ran out to the curb when his beeper signaled

that his car alarm had been triggered.

From the front steps of the house, Bryan and Richards saw Spencer and Gittens struggling

in the car. While the two fought, a man emerged further up the street with his gun drawn. (Tr.

513-14; 545-46.) Bryan hurried back inside to call the police, but Richards saw the man with the gun fire two shots at the car. (Tr. 514; 548.) The shooter fired a third time as Spencer began to come after him, leaving Gittens and the car. (Tr. 524.) Richards heard at least nine more gunshots as Spencer chased the shooter behind the house across the street. (Id.) He then saw Spencer come around the corner and collapse. (Tr. 514-15.) Bryan heard three shots fired in quick succession from inside her house while she was calling the police, and more shots as she came back outside. (Tr. 549.) She, too, saw Spencer lying in the street. (Id.)

Spencer died as a result of a gunshot wound to his face and injuries to his throat and left lung. (Tr. 1012-15.) The bullet recovered from his body was a .38 caliber that could have been fired from either a .38 caliber gun or a nine millimeter gun, but the markings on the bullet were more consistent with an automatic weapon. (Tr. 986-88, 1016.) Three nine millimeter shells, all fired from the same gun, two lead fragments, and one copper jacketing were recovered from the crime scene. (Tr. 781, 980.) A piece of deformed lead was recovered inside Spencer's car from a bullet that had broken the window. (Tr. 781-83.)

Fingerprints and blood evidence were also collected from the crime scene. One of the prints, lifted from the exterior passenger window of the car that petitioner and Gittens arrived in, matched petitioner. (Tr. 847-48.) The blood recovered was consistent with Spencer's blood. (Tr. 1019-20, 1021-22.)

Petitioner was arrested on May 13, 1998, nearly seventeen years after the shooting. He was charged with three counts of second degree murder (intentional, depraved indifference and felony murder), two counts of first-degree attempted robbery, second-degree attempted robbery, second-degree criminal possession of a weapon, and third-degree criminal possession of a

weapon. Gittens was apprehended on an unrelated immigration matter nine months later, in February of 1999. (Tr. 1139.) He entered into a cooperation agreement pursuant to which he was to receive a sentence of two and one-half to five years for his involvement in Spencer's murder. (Tr. 1081-83.)

At petitioner's jury trial, Gittens testified that he was trying to determine whether he could steal the radio without his tools when Spencer came at him and thrust him against the car. (Tr. 1062, 1065.) The two began to struggle with each other, and Spencer reached toward his ankle. (Tr. 1065-67.) Gittens, thinking that Spencer had a gun, began shouting about a gun. (Tr. 1067-68, 1151-2.) Spencer, however, did not have his gun out of his ankle holster. (Tr. 1150.) Gittens then saw someone run across the street, looked up, and realized it was petitioner. (Tr. 1067.) Petitioner stopped in front of the car, pointing a nine millimeter automatic gun. (Tr. 1067-72.) Gittens broke away and ran down the street toward the car he drove, and petitioner ran back across the street. (Tr. 1073.) Gittens heard gunshots as he fled. (Tr. 1074.)

After the shooting stopped, Gittens turned back up the block in time to see Spencer come out from between the houses and fall onto the sidewalk. (Id.) When he reached Hollis Avenue and 199th Street, he heard petitioner call out to him that he had been hit. (Tr. 1075.) Gittens could see that petitioner had been shot in the leg but was not bleeding a lot, and he took petitioner to a taxi. (Id.) That night, petitioner was wearing a tam, a type of hat that can be pulled down into a face mask, and had a beard. (Tr. 1051)

Neither Richards nor Bryan could identify petitioner as the shooter. Richards could not tell what the shooter's face looked like, (Tr. 530), and thought that it seemed to be covered with "some kind of stocking cap" (Tr. 527). Bryan described the shooter as a light-skinned black

3

man, with a short haircut or tied-back braids. (Tr. 550, 553, 559.) She did not think that the shooter's face was covered, but she could not tell if he had facial hair. (Tr. 559.)

Lorraine Chambers, an eleven-year-old girl who lived at 109-45 197th Street, saw a man struggling to climb over her back fence between 8:30 and 9:30 p.m. that night. (Tr. 896-99.) He was about twenty-two feet away from her and was visible within the light cast from inside the house and an outside light. (Tr. 899, 904.) Chambers described him as a light-skinned black male, possibly Jamaican, with a beard and a tam hat with "a lot of hair in the hat, like dreads." (Tr. 900.) She noticed that when he ran away, he had a limp. (Tr. 909.)

Peter Blake, a longtime friend and criminal associate of petitioner's, also testified at trial. Blake said that when he and petitioner were selling drugs together in Texas in 1986, petitioner told him that he had shot a customs agent who interrupted him in the course of stealing a car in Queens. (Tr. 639-41.) He also testified that petitioner usually wore a ski mask folded like a tam, had a low haircut at the time, and carried a Beretta nine millimeter gun. (Tr. 660-63.) In 1991, when Blake first spoke to the authorities about petitioner, he was serving a sentence of fifty years and eight months for drug trafficking and drug and gun possession. In 1996, however, in accordance with the Supreme Court's ruling in Bailey v. United States, 516 U.S. 137 (1995) (holding that "use" means active employment of firearm under § 924(c)(1)), Blake's sentence was reduced to fifteen years. When he testified, he was not eligible for any further sentence reduction. (Tr. 658-60.)

Petitioner called a single witness, Daisy Nelson. She lived on 200th Street near Hollis Avenue across the street from Marva Bryan's house and was home on the night of the shooting. From inside her house, Nelson heard gunfire and two sets of feet running down her driveway.

4

(Tr. 1209-11.) Contrary to the other witnesses, she said that the final shots she heard sounded like they came from across the street in front of her house. (Tr. 1211.) The police removed bullet fragments from the front door and side of Nelson's house. (Tr. 1213-14.) On summation, defense counsel argued that the final shots Nelson heard could have come from Gittens. (Tr. 1288.)

Petitioner was convicted of depraved indifference murder and felony murder, two counts of first-degree attempted robbery, second-degree criminal possession of a weapon and third-degree criminal possession of a weapon. He was sentenced on July 15, 1999, to concurrent terms of twenty-five years to life on the murder counts, five to fifteen years on each of the first-degree robbery and second-degree weapons possession counts, and two and one-third to seven years on the third-degree weapons possession count.

Petitioner appealed, challenging the sufficiency of the evidence and claiming that he was deprived of due process as a result of the admission of uncharged crimes evidence. He also claimed that the trial court wrongly refused to admit a police memorandum into evidence and erred in denying his request for a justification charge. In addition, he raised claims of ineffective assistance of counsel and challenged his sentence as illegally imposed. All of petitioner's claims were rejected by the Appellate Division on April 1, 2002, People v. McCarthy, 740 N.Y.S.2d 381 (App. Div. 2002), and leave to appeal to the Court of Appeals was denied on August 29, 2002, People v. McCarthy, 98 N.Y.2d 711 (2002).

On December 2, 2002, petitioner moved to vacate his judgement of conviction pursuant to New York Criminal Procedure Law § 440 on the ground that the prosecutor withheld exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963). After a full

5

hearing and consideration of post-hearing memoranda, the state court denied the motion in a detailed decision and order on September 3, 2002. People v. McCarthy, No. 1959/98 (N.Y. Sup. Ct. Sept. 3, 2003) (Memorandum and Order on Motion to Vacate). On January 22, 2004, the Appellate Division denied leave to appeal.

Petitioner seeks habeas relief based on the same grounds he raised in state court.

## Discussion

### I. Standard of Habeas Review

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). "'[C]learly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta . . . as of the time of the relevant state-court decision.'" Carey v. Musladin, 549 U.S. 70, 74 (2006) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000). "No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Rodriguez v. Miller, 537 F.3d 102, 106-07 (2d Cir. 2008) (citing Musladin, 549 U.S. at 74, 77).

A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts governing Supreme Court precedent or the state court confronts a

set of facts that is materially indistinguishable from a Supreme Court decision and arrives at a

different result. Williams, 529 U.S. at 413. A decision is an "unreasonable application" of

federal law if the state court's application of governing Supreme Court precedent is objectively

unreasonable. Id. at 409, 413; see also Mask v. McGinnis, 252 F.3d 85, 88-89 (2d Cir. 2001);

Francis S. v. Stone, 221 F.3d 100, 109-11 (2d Cir. 2000). An erroneous application of federal

law is not necessarily an unreasonable one. Williams, 529 U.S. at 410-11. Nevertheless, as

interpreted by the Second Circuit, "although '[s]ome increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise habeas relief would be limited to state

court decisions so far off the mark as to suggest judicial incompetence.'" Mask, 252 F.3d at 89

(quoting Francis S., 221 F.3d at 111).

On habeas review, factual determinations are presumed correct, and the petitioner bears

the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28

U.S.C. § 2254(e)(1). The Second Circuit has noted that "this presumption of correctness is

particularly important when reviewing the trial court's assessment of witness credibility."

Shabazz v. Artuz, 336 F.3d 154, 161 (2d Cir. 2003) (citations omitted).


II. Sufficiency of the Evidence

When considering a sufficiency claim, this Court must determine whether:

> viewing the evidence in the light most favorable to the prosecution,
> any rational trier of fact could have found the essential elements of
> the crime beyond a reasonable doubt. This familiar standard gives
> full play to the responsibility of the trier of fact fairly to resolve
> conflicts in the testimony, to weigh the evidence, and to draw
> reasonable inferences from basic facts to ultimate facts. Once a
> defendant has been found guilty of the crime charged, the

7

> factfinder's role as weigher of the evidence is preserved through a
> legal conclusion that upon judicial review all of the evidence is to
> be considered in the light most favorable to the prosecution.

Jackson v. Virginia, 443 U.S. 307, 319 (1979) (internal citation omitted; emphasis in original).

"[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Thus, a petitioner challenging the sufficiency of the evidence bears a heavy burden and is entitled to relief only if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324. Petitioner does not meet this burden with respect to any of his sufficiency claims. Accordingly, the Appellate Division's rejection of these claims was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to relief.

A. *Blake's Credibility and Corroboration*

Petitioner contends that the indictment should be dismissed for insufficient corroboration of Gittens's accomplice testimony. He argues that the only corroboration evidence the prosecution offered was Peter Blake's testimony, but asserts that Blake's testimony was incredible as a matter of law because of his extensive criminal record and extraordinarily favorable cooperation agreement.

This particular claim is not cognizable on habeas. There is no federal or constitutional requirement that accomplice testimony be corroborated. See, e.g., United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993) ("A conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of

establishing guilt beyond a reasonable doubt. Any lack of corroboration goes to the weight of the evidence, not to its sufficiency . . . ." (internal citations omitted)); see also United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) (citing United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)).

Moreover, "under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995); see also Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues"); United States v. Shulman, 624 F.2d 384, 388 (2d Cir. 1980) (resolution of credibility issues are generally exclusively for the jury, though "theoretically the testimony of a witness might be so incredible that no reasonable juror could believe him"). As the Appellate Division expressed when specifically rejecting petitioner's sufficiency challenge to his attempted robbery convictions based on Blake's incredibility, "resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury, which saw and heard the witnesses." McCarthy, 740 N.Y.S.2d at 383.

Furthermore, there is no merit to petitioner's proffered reasons for rejecting Blake's testimony as incredible. The criminal history of a witness and the witness's possible self-interest in testifying may impact the weight of the evidence, but these matters were fully explored before the jury. Significantly, there is no apparent connection between Blake's cooperation in this case and his dramatic sentence reduction; once Blake's sentence was reduced more than thirty-five years pursuant to Bailey v. United States, he was not eligible for any further reductions. Thus,

petitioner's overall sufficiency challenge based on the alleged incredibility of Blake is rejected.

B. *Felony Murder, Attempted Robbery and Weapons Possession*

Petitioner specifically attacks the sufficiency of the evidence supporting his attempted robbery and felony murder convictions on the ground that there was insufficient proof of force, the element necessary to convert the attempted theft—which petitioner contends was only an attempted larceny—into the felony of attempted robbery.[1]  He further challenges the felony murder conviction on the ground that there was insufficient evidence that he and Gittens acted together in the attempted robbery.[2]  In addition, he attacks his conviction for second-degree weapon possession by challenging the sufficiency of the evidence of his intent to use his weapon unlawfully.

Blake's credibility is again at the heart of these challenges, and the Court must defer to the jury's assessment.  A rational juror was entitled to credit Blake's testimony that petitioner said he planned the robbery with Gittens and thus find they both participated in the robbery attempt underlying the felony murder conviction.  Gittens's conflicting testimony that he was not trying to steal the car and that he made the decision to steal the car radio on his own after petitioner went into Star Wars does not render the evidence insufficient.  Indeed, it was in

---

[1]  A person "commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of . . . preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking." N.Y. Penal Law § 160.00.

[2]  A person commits felony murder when "[a]cting either alone or with one or more persons, he commits or attempts to commit robbery . . . and in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants." N.Y. Penal Law § 125.25.

Gittens's self-interest to claim that he acted alone in order to minimize his own role in the ensuing murder, and it was for the jury to decide which witness to believe. Moreover, contrary to petitioner's assertion, Blake's testimony that Gittens and petitioner planned the robbery together is not undermined by the undisputed fact that petitioner himself was never inside Spencer's car. Apart from Blake's testimony, the circumstances surrounding the incident reasonably support an inference that petitioner and Gittens were acting in concert: the two arrived together, and when Spencer thwarted Gittens's efforts to steal either the car or the car radio, petitioner emerged with his gun drawn. Whether pre-planned or not, clearly at that point petitioner volunteered his deadly services to the criminal endeavor.

With respect to the evidence of force, a rational juror also could have readily concluded that the reason petitioner fired at Spencer's car was to overcome Spencer's resistance to the theft. Petitioner argues that the jury should have concluded that he fired solely to rescue Gittens from Spencer's attack. For sufficiency purposes, however, the question is only whether a rational juror could have drawn the inference consistent with guilt. For the same reason, petitioner's challenge to his conviction for second-degree weapon possession also fails.

C. *Depraved Indifference Murder*

1. *Applicable Law*

Under New York Penal Law, a person is guilty of depraved indifference murder when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal Law § 125.25(2). "A person acts recklessly . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur." N.Y.

Penal Law § 15.05(3). At the time of petitioner's conviction, under the controlling case People

v. Register, 60 N.Y.2d 270, 276 (1983), "depraved mind murder include[d] both a mental

element ('recklessly') and a voluntary act ('engaging in conduct which creates a grave risk of

death to another person')." The statutory requirement of "[u]nder circumstances evincing a

depraved indifference to human life," was construed to refer to "a definition of the factual setting

in which the risk creating conduct must occur." Id. As reaffirmed in People v. Sanchez, 98

N.Y.2d 373 (2002),

> Register requires a significantly heightened recklessness,
> distinguishing [depraved indifference murder] from manslaughter
> in two ways. First, "in a depraved mind murder the actor's conduct
> must present a grave risk of death whereas in manslaughter it
> presents the lesser substantial risk of death." Then, it also requires
> proof of circumstances manifesting a depraved indifference to
> human life, focusing the inquiry, as we have seen, "upon an
> objective assessment of the degree of risk" which "converts the
> substantial risk present in manslaughter into a very substantial
> risk"

Id. at 380 (quoting Register) (citations omitted; emphasis in original). New York depraved

indifference murder law "remained static" through the court's decision in Sanchez:

> Sanchez epitomized [the New York Court of Appeals']
> depraved indifference jurisprudence under the Register regime, the
> hallmarks of which—at least with respect to fatal one-on-one
> shootings or knifings—were twofold. First, even though such an
> attack by its very nature presents compelling circumstantial
> evidence of intent to cause death, we considered the question of the
> defendant's state of mind to be a classic matter for the jury. . . .

> Second, the factual setting in which the risk-creating
> conduct must occur, viewed objectively—Register's standard for
> determining whether there are circumstances evincing a depraved
> indifference to human life—was fulfilled if a defendant's actions
> created an almost certain risk of death by, for example, shooting
> the victim in the head multiple times at close range. As [the court]
> expressed this concept in Sanchez, where the defendant's actions

created "a transcendent risk" of causing death, "the level of
manifested depravity needed to establish [depraved indifference
murder]" was "readily" met.

Policano v. Herbert, 7 N.Y.3d 588, 599-600 (2006) (quoting Sanchez, 98 N.Y.2d at 378).

Sanchez was decided on July 9, 2002, just prior to the denial of petitioner's leave application by

the Court of Appeals. In Sanchez, the defendant and the victim, who were the boyfriends of two

sisters, exchanged "harsh words," and then the defendant abruptly turned around and fired a gun

at the victim's chest at close range from behind a partially opened door. Sanchez, 98 N.Y.2d at

375-76. The court upheld the conviction for depraved indifference murder on the ground that the

jury reasonably could have found that the shooting was "sudden, spontaneous and not

well-designed to cause imminent death," and may have "concluded that [it] was an instantaneous,

impulsive shooting—perhaps to disable or frighten [the victim], rather than to kill him. Thus, a

jury reasonably could have found that defendant's homicidal level of mental culpability was

reckless rather than intentional." Id. at 377-78.

As emphasized in Policano, however, "it has never been permissible in New York for a

jury to convict a defendant of depraved indifference murder 'where the evidence produced at trial

indicated that if the defendant committed the homicide at all, he committed it with the conscious

objective of killing the victim.'" Policano, 7 N.Y.3d at 600 (citation omitted). Nevertheless,

under the Register formulation,

> [t]hat a defendant's acts virtually guaranteed the victim's death did
> not, in and of itself, preclude a guilty verdict on a theory of
> depraved indifference. To the contrary . . . the very facts
> establishing a risk of death approaching certainty and thus
> presenting compelling circumstantial evidence of intent—for
> example, a point-blank shooting of the victim in the
> head—likewise demonstrated depraved indifference.

13

Id. at 601. As the Court of Appeals explained, "under Register . . . where both intentional and depraved indifference murder were charged in one-on-one shootings or knifings, these counts were submitted to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally." Id. at 600-01 (emphasis added).

After petitioner's conviction became final,[3] the interpretation of one of the elements of depraved indifference murder, "under circumstances evincing a depraved indifference to human life," "gradually and perceptibly changed from an objectively determined degree-of-risk standard (the Register formulation) to a mens rea." Id. at 602-03. As stated by the Court of Appeals, "[t]he purpose of [the] new interpretation of 'under circumstances evincing a depraved indifference to human life' [was] to dispel the confusion between intentional and depraved indifference murder, and thus cut off the continuing improper expansion of depraved indifference murder." Id. at 603. The changes began with People v. Hafeez, 100 N.Y.2d 253 (2003), decided on June 10, 2003, continued with People v. Gonzalez, 1 N.Y.3d 464 (2004), People v. Payne, 3 N.Y.3d 266 (2004), and People v. Suarez, 6 N.Y.3d 202 (2005), and ended with People v. Feingold, 7 N.Y.3d 288 (2006). Id. Under current New York law,

> it is now clear that . . . "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder" (Payne, 3 N.Y.3d at 272); that "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances" (Suarez, 6 N.Y.3d at 212); and that "'depraved indifference to human life' is a culpable mental state" (Feingold, 7 N.Y.3d at 296).

---

[3] Petitioner's conviction became final in November 2002, ninety days after the Court of Appeals denied leave to appeal on August 29, 2002. See 28 U.S.C. § 2244(d)(1)(A); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).

Id. at 601. The court acknowledged, however, that:

> [a]s the many concurring decisions and dissents in these cases and
> the dissent in this case illustrate, individual judges hold differing
> views as to where along this trajectory a majority of the Court may
> have effectively passed the point of no return—the limit beyond
> which, hard as we may have tried, it was simply not possible to
> reconcile our developing case law with Register and Sanchez.

Id. at 603. While the Court of Appeals left open the question of which case represented the

"point of no return,"[4] it held that the post-Sanchez case law did not apply retroactively. Id.

The Second Circuit recently addressed, as a question of first impression, "whether, or

under what circumstances, due process requires that a new interpretation of a criminal statute by

a state's highest court be applied retroactively on collateral review." Henry v. Ricks, 578 F.3d

134, 139-140 (2d Cir. 2009). Noting that in Policano, "the New York Court of Appeals applied

its own precedent to determine whether its new interpretation of New York Penal Law

§ 125.25(2) applied retroactively and concluded that it did not," the Circuit held that the Due

Process Clause does not require retroactive application of the new interpretation. Id. at 141.

Thus, this Court must apply New York law as it existed at the time petitioner's conviction

---

[4] After Policano, in People v. Baptiste, 853 N.Y.S.2d 719 (App. Div. 2008), leave to
appeal denied, 10 N.Y.3d 932 (2008), the Appellate Division, Third Department, concluded that
Payne was "'the point of no return'—the first case that was irreconcilable with Sanchez—it
marks the cut-off date for application of the new rule." Id. at 728. The court reasoned that after
Payne, "depraved indifference murder may be found only where a defendant's conduct endangers
others indiscriminately or in narrowly defined factual circumstances evincing uncommon
brutality—set forth in People v. Payne, 3 N.Y.3d at 271, and further clarified in People v. Suarez,
6 N.Y.3d at 212-215—demonstrating lack of intent combined with 'a depraved kind of
wantonness.'" Id. at 727 (internal quotation and citation omitted). "Depraved indifference is now
treated as a mental state evinced only by certain narrow factual circumstances, and can no longer
be 'established by recklessness coupled only with actions that carry even an inevitable risk of
death,' as in Sanchez." Id. at 728 (citation omitted).

became final. See also Flowers v. Fisher, 296 Fed.Appx. 208, 210 (2d Cir. 2008) ("We look to New York law as it existed at the time [petitioner's] conviction became final, as the New York Court of Appeals has found that although the law on depraved indifference has changed significantly in recent years, those changes do not apply retroactively."). Therefore, none of the post-Sanchez changes to depraved indifference murder law applies to this petition, and the Court analyzes petitioner's sufficiency claim under Register and Sanchez.

### 2. *Petitioner's Claims*

Petitioner argues that the evidence compels the conclusion that his conduct was intentional and not reckless because he fired only once and at close range. Petitioner's version of the altercation, however, is not supported by the evidence that a running gun battle took place. Richards testified that he heard more than eleven shots and witnessed petitioner fire three times—twice at the car in which Spencer and Gittens were fighting and once at Spencer as the chase began. In addition, three nine millimeter shell casings that could not have come from Spencer's gun were recovered from the scene, and Spencer's revolver contained only six spent rounds. Thus, the evidence indicates that petitioner fired his gun no fewer than three and at least five times. Further, the medical examiner testified that Spencer died from a bullet that entered his face near his chin and caused internal wounds including a perforated left lung. The medical examiner was not questioned, however, about whether the shot was fired at close range, nor is there any indication of it in the record. This case is not one in which there was "absolutely no evidence whatsoever that the defendant might have acted unintentionally." Policano, 7 N.Y.3d at 601. Rather, a reasonable juror could have concluded that petitioner did not intend to kill or even hit petitioner when he fired at him, but merely intended to scare him away. Thus, under Register,

the question of petitioner's state of mind was properly left to the jury.

Petitioner also challenges the Appellate Division's determination that under Register there was sufficient evidence that petitioner "acted with depraved indifference to human life in causing Spencer's death." McCarthy, 740 N.Y.S.2d at 382. Specifically, the court pointed to the evidence that petitioner "engaged in a gun battle with Spencer while running down the street, thereby exposing bystanders to the risk of harm" and that "[i]n the course of the gun battle, the defendant shot Spencer in the face, causing his death, and fled the scene." Id. In attacking the decision, petitioner misstates the evidence and artificially segments the ongoing exchange of gunfire. He argues that because Gittens's testimony established that he was struggling with Spencer inside the car, and shots were fired at close range in a downward direction into the car, the exchange of gunfire could not have put any bystanders at risk. He also contends that petitioner fired only twice—once into the windshield of the car and once off the street between the houses—and that the circumstances surrounding those shots were such that no bystanders were exposed to harm.

Again, petitioner's account of the gun fight is not supported by the evidence in the record. Richards testified that he heard not just two but more than eleven shots, three of which he saw petitioner fire. (Tr. 524.) Bryan heard those three shots, fired in quick succession, right after she went inside and dialed the police. (Tr. 548.) Moreover, contrary to petitioner's version, Gittens testified that there were people out on the street during the altercation (Tr. 1152), and that the struggle did not occur inside the car. Rather, Spencer "shoved [him] up against the car . . . between the passenger door and the car frame itself" (Tr. 1066), and each tried to push the other inside the car. (Tr. 1066-97.) Nelson testified that bullet fragments were removed from her

house (Tr. 1213-14), reflecting that she, too, was at risk.

The Court of Appeals has consistently distinguished <u>Sanchez</u> from other cases in which it has struck down depraved indifference murder convictions on the ground that it involved "the sudden shooting of a victim by a defendant who reached around from behind a door and fired into an area where children were playing, presenting a heightened risk of unintended injury." Thus, in <u>Sanchez</u>, the acts were "imminently dangerous and presented a very high risk of death to others" as required by <u>Register</u>. <u>See</u> <u>Hafeez</u>, 100 N.Y.2d at 259 (quoting <u>Register</u>, 60 N.Y.2d. at 274); <u>Gonzalez</u>, 1 N.Y.3d at 468 (quoting <u>Hafeez</u>); <u>Payne</u>, 3 N.Y.3d at 271 (same); <u>see also</u> <u>Illis v. Artus</u>, No. 06-CV-3077, 2008 WL 5666638, *16 & n.14 (E.D.N.Y. June 5, 2008) (Although "the Court of Appeals in <u>Sanchez</u> neither relied on the danger posed to the children, <i>i.e.</i> others apart from the intended victim, as a decisive factor supporting a finding of depraved indifference murder, nor suggested that such a fact was crucial to its reasoning," it distinguished <u>Sanchez</u> in <u>Hafeez</u>, <u>Gonzalez</u>, and <u>Payne</u> on this ground alone.). In <u>Payne</u>, the court explicitly noted:

> [We] thus differentiated cases like the one before us (and <u>Gonzalez</u>) from homicides in which a defendant lacking the intent to kill (but oblivious to the consequences and with depraved indifference to human life) shoots into a crowd or otherwise endangers innocent bystanders. <u>People v Jernatowski</u>, 238 NY 188 (1924) is a prominent example of this genre. There, the defendant fired shots into a house, killing the wife of a man with whom he had a confrontation. Similarly, in <u>People v Fenner</u>, 61 NY2d 971 (1984), defendant fired into a fleeing crowd. In <u>People v Russell</u>, 91 NY2d 280 (1998), defendant shot and killed an innocent bystander during a gun battle and in <u>People v Gomez</u>, 65 NY2d 9 (1985), defendant struck a child with a car, accelerated, and killed another child while speeding on crowded sidewalks.

<u>Payne</u>, 3 N.Y.3d at 271. Moreover, the court articulated the shift in depraved indifference murder law by making an exception for cases like <u>Sanchez</u> where bystanders were at risk:

> Firing more rounds or inflicting more wounds does not make the
> act more depravedly <u>indifferent</u>, but more intentional. Absent the
> type of circumstances in, for example, <u>Sanchez</u> (where others were
> endangered), a one-on-one shooting or knifing (or similar killing)
> can almost never qualify as depraved indifference murder.

<u>Id.</u> at 272 (emphasis in original).   Thus, there is no basis for disturbing the Appellate Division's

sufficiency determination. Petitioner is not entitled to relief.


## III. <u>Failure to Charge Justification</u>

Petitioner also challenges his conviction on the ground that the trial court refused to

charge justification to the jury.  In a related claim, he contends that because his actions were

justified, there was insufficient evidence of recklessness to support his conviction for depraved

indifference murder.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations

on state-law questions.  In conducting habeas review, a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States." <u>Estelle v.</u>

<u>McGuire</u>, 502 U.S. 62, 67-68 (1991).  Nevertheless, a state law error that results in a due process

violation is cognizable.  Thus, habeas relief may be granted "for a failure to charge justification

where the evidence supported a justification charge under state law and where the erroneous

failure to give such a charge was sufficiently harmful to make the conviction unfair." <u>Davis v.</u>

<u>Strack</u>, 270 F.3d 111, 123-24 (2d Cir. 2001) (citing <u>Cupp v. Naughten</u>, 414 U.S. 141, 146

(1973)).

As a first step in finding a due process violation, the Court must determine whether,

based on the evidence, petitioner was entitled to a justification charge. <u>See Jackson v. Edwards</u>,

404 F.3d 612, 621 (2d Cir. 2005). Under New York law, justification is not a defense to charges of felony murder, attempted robbery or weapons possession. Ellison v. Hoke, No. 93 CV 3048, 1995 WL 561344, *3 (E.D.N.Y. Sept. 15, 1995) (citing People v. Ellison, 573 N.Y.S.2d 202, 203 (App. Div. 1991), regarding attempted robbery and felony murder); Davis, 270 F.3d at 134 (citing, e.g., People v. Pons, 68 N.Y.2d 264, 265 (1986), regarding weapons possession). Justification may, however, apply to charges of intentional and depraved indifference murder. "A justification charge is warranted, 'if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified.'" Jackson, 404 F.3d at 622 (quoting People v. Padgett, 60 N.Y.2d 142, 145 (1983)). Further, "[i]n determining whether the evidence warrants a justification charge, the reviewing court must view the record in the light most favorable to the defendant." Id. The defense has both a subjective and an objective component—"[t]he factfinder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances." Id. at 623 (citations omitted). The defense is not available to a defendant who was "the initial aggressor" unless he "has withdrawn from the encounter and effectively communicated such withdrawal." New York Penal Law § 35.15(1)(b).

Petitioner contends that the jury could have concluded that he was protecting Gittens from an unknown attacker with a gun when he fired his weapon. In support, he points to Gittens's testimony that during his struggle with Spencer, (1) Spencer reached toward his ankle as if he were reaching for a gun (Tr. 1067-68, 1151); (2) Gittens began screaming that Spencer had a gun, (Tr. 1151-52); and (3) when Gittens saw petitioner, he thought "now I got two guns to deal with." (Tr. 1067.) Gittens's sense that Spencer was reaching toward his ankle as if he had a

gun and his thought that he had two guns to deal with are not relevant to whether either petitioner or a reasonable person approaching the scene of the struggle would have believed deadly physical force was necessary. Moreover, the record does not support petitioner's assertion that Spencer drew his gun in the car. When asked on cross whether Spencer's gun was out, Gittens testified: "It might have been. I'm not sure it did. I don't think it was," (Tr. 1148), and "To the best of my recollection, while he held me down, he didn't have his gun out of his holster." (Tr. 1150). Thus, no reasonable view of the evidence supports the conclusion that petitioner's actions were justified. No reasonable juror could have concluded, based on Gittens screaming about a gun, that petitioner's firing into the car, much less repeatedly at Spencer during the ensuing chase, was necessary in Gittens's defense. For these same reasons, no reasonable juror could have found petitioner's actions were justified.

Alternatively, petitioner contends the jury could have concluded that he was acting in his *own* defense. He argues that even if he were the initial aggressor when he fired at the car, he withdrew by fleeing, and that when he shot Spencer during the chase, he could no longer retreat safely because he had been wounded. Again, the evidence does not support petitioner's contention that he ran in an effort to withdraw; he fired at least five shots during the ongoing, running gun battle.

Finally, the failure to give the charge did not deny petitioner the right to present a defense. Petitioner fully litigated his misidentification defense. Compare Davis v. Strack, 270 F.3d at 131-32 (due process violation where defendant who confessed to intentional shooting was deprived of his "highly credible defense" and his conviction was "guaranteed" by the trial court's failure to charge justification) with Blazic v. Henderson, 900 F.2d 534, 541-43 (2d Cir. 1990) (no

due process violation where defendant's principal claim that shooting was an accident was inconsistent with defense of justification).

IV. Erroneous Admission of Uncharged Crimes

Petitioner contends that because "a mountain of evidence" of uncharged crimes was improperly admitted, he was denied his constitutional right to a fair trial. Specifically, Blake was permitted to detail the long history of his criminal activities with petitioner on the ground that exploration of his relationship with petitioner was necessary for the jury to understand why petitioner would have trusted Blake enough to admit to him that he murdered Spencer, and why Blake would disclose petitioner's confession to the authorities. Petitioner argues that much of the evidence, including testimony about petitioner's violent activities that either did not involve Blake or related to crimes committed after petitioner confessed, was far more prejudicial than probative and constituted impermissible propensity evidence. Petitioner also challenges the court's rulings that permitted Gittens to testify that he had seen petitioner with a nine millimeter gun on the day of the shooting (Tr. 1071), that petitioner had a preference for Berettas (Tr. 1071-72), and that petitioner was a drug dealer. (Tr. 1056.) Because the Appellate Division's rejection of petitioner's claims was neither contrary to nor an unreasonable application of federal law, petitioner is not entitled to relief.

A. *Blake's Testimony*

Blake testified that he became friends with petitioner in Kingston, Jamaica, at the age of twelve. (Tr. 603.) Beginning as young teens, together they burglarized approximately ten houses over a ten year period. (Tr. 605-08.) In addition, both Blake and petitioner spent time in a

Jamaican prison in 1976—Blake for exchanging gunfire with Jamaican soldiers and petitioner for shooting a prison guard. (Tr. 610-11, 613-614.) Petitioner remained in prison as a "threat to the country" and was not released until Jamaica lifted its declared state of emergency. (Tr. 615-16.) Blake was released in 1977, but did not see petitioner again until 1986 in Dallas, Texas. (Tr. 616, 619-20.)

Blake entered the United States in 1985 with false documents. (Tr. 620.) He knew that petitioner was in New York at the time, but he did not know exactly where. (Tr. 621.) Blake worked in Boston as an "enforcer" for a drug dealer, but when his boss was shot dead, he moved briefly to Manhattan and then to Dallas, Texas. (Tr. 622-28.). In Dallas, Blake opened a crack house. (Tr. 629.) He then learned that petitioner, too, was in Dallas. (Tr. 631.) The two reunited and, and although they each had their own drug houses—petitioner selling marijuana and Blake selling crack cocaine—they "c[a]me together as a family." (Tr. 634-35.) At some point later in 1986, they then began selling cocaine together. (Tr. 635-36). They sold approximately thirty kilograms of cocaine a month, for $60,000-$65,000 per kilogram. (Tr. 636.)

Blake testified that in 1986, when he asked petitioner why he had come to Dallas, petitioner admitted that he killed a customs agent in New York in 1981. (Tr. 639-40.) Blake said:

> [Petitioner] tell me that they were burglarizing a car in Queens, and then this man come out and see him, so he tried to walk away and that the man was running after him and shooting after him, and he turned around and shot the man in his face, and next day he saw it in the paper where he kill a custom agent . . . .
> . . . .
> He tell me that he was burglarizing a car to go on a burglary on Long Island. He said they were burglarizing a BMW. . . . So he said when he was burglarizing it, and the man come and the man

shoot after him and the man shot him in his [leg], he turned around
and shoot him in the face.

(Tr. 640-41.) The Spencer shooting came up again when petitioner asked Blake to find a doctor

to try to remove a bullet from his leg. (Tr. 642.) Blake also testified that in 1990, he was with

petitioner when petitioner ordered that someone be killed and that the hit was carried out. (Tr.

639.) Blake did not supply any details of the hit, and no other evidence of it was introduced.

When petitioner was hospitalized in 1988, Blake protected petitioner's money and took

care of his business. (Tr. 644.) Later in 1990, Blake was arrested for federal drug trafficking and

firearms offenses. (Tr. 644.) He was found guilty and sentenced to fifty years and eight months

in prison. (Tr. 645.) Blake testified that he was a "loyal soldier" and "ma[d]e up [his] mind to do

[his] time," and that petitioner assured him that he would take care of Blake's drug business and

family. (Tr. 646.) Despite petitioner's assurances, petitioner's wife "destroyed" Blake's family

by telling his wife that Blake had a child with another woman and was having relations with his

wife's sisters. (Tr. 647, 717-718.) Petitioner "br[oke] the rules and regulation[s]." (Tr. 719.) As

a result, Blake was angry with petitioner and willing to testify against him. (Tr. 718-19.)

B. *Appellate Division Ruling*

The Appellate Division determined that the trial court erred by failing to hold a

Ventimiglia hearing and failing to issue a limiting instruction at the time the uncharged crimes

evidence was admitted. Nevertheless, the state appellate court found these errors harmless on the

ground that "the testimony of nonaccomplice witnesses provided overwhelming corroboration of

the testimony of the defendant's accomplice." McCarthy, 740 N.Y.S.2d at 383. In a detailed

dissent, Justice Goldstein of the Appellate Division disagreed, finding the evidence against

24

petitioner "underwhelming" and the evidentiary errors, consequently, not harmless. Id. at 386. Justice Goldstein emphasized the fact that Gittens was an accomplice testifying pursuant to a cooperation agreement that dramatically limited his sentence and that Blake became an informant after he was sentenced to fifty years in prison. In addition, he characterized Blake's version of the events as "sharply divergent" from Gittens's version, which was supported by the other witnesses. Id.

C. *Analysis*

The right to a <u>Ventimiglia</u> hearing—a hearing to determine the admissibility of uncharged crimes evidence—is purely a matter of state law. <u>See</u>, <u>e.g.</u>, <u>Pena v. Fischer</u>, No. 00 Civ. 5984, 2003 WL 1990331, at *10 (S.D.N.Y. Apr. 30, 2003) (citing <u>Jones v. Artuz</u>, No. 97-CV-2063, 2002 WL 31006171, at *9 (E.D.N.Y. Aug. 30, 2002)). Consequently, the trial court's failure to conduct such a hearing cannot be grounds for habeas relief. Moreover, evidentiary rulings are generally matters of state law, and errors that do not rise to the level of a violation of federal law are not cognizable on habeas review. <u>Estelle</u>, 502 U.S. 62, 67-68 (1991). This Court may consider only whether erroneous evidentiary rulings resulted in a violation of the Due Process Clause.

Both Federal and New York state law permit the admission of evidence of uncharged crimes other than to show propensity, and the Supreme Court has ruled that "[w]here the prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process." <u>Dunnigan v. Keane</u>, 137 F.3d 117, 125, <u>cert.</u> <u>denied</u>, 525 U.S. 840 (1998) (quoting <u>Estelle</u>, 502 U.S. at 69). The Supreme Court, however, has not ruled on the issue of "whether a state law would violate the Due Process Clause if it

25

permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." Id. at 75 n.5. Thus, general due process standards apply.

To warrant relief on due process grounds, the uncharged crimes evidence in question must be "so extremely unfair that its admission violates fundamental conceptions of justice." Dunnigan, 137 F.3d at 125 (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)). Further, it must be "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short, it must have been crucial, critical, highly significant." Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985) (internal quotation and citation omitted). Moreover, even if admission of the evidence is an error of constitutional dimension, habeas relief is only appropriate when the error has a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see also Fry v. Pliler 551 U.S. 112, 121-22 (2007) ("[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman.") (internal citations omitted). In determining whether an error had a substantial and injurious effect, "the principal factors to be considered are the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) (citing Brecht, 507 U.S. at 639; Kotteakos, 328 U.S. at 762; Dunnigan, 137 F.3d at 130; United States v. Concepcion, 983 F.2d 369, 379-80 (2d

26

Cir. 1992)).  As the Second Circuit set forth in <u>Wray</u>:

> In assessing the wrongly admitted testimony's importance, [the Court] consider[s] such factors as whether the testimony bore "on an issue that is plainly critical to the jury's decision"; whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative; and whether the wrongly admitted evidence was emphasized in arguments to the jury.
> . . . . [The Court] analyze[s] all of these issues in light of the record as a whole.

<u>Wray</u>, 202 F.3d at 526 (2d Cir. 2000) (internal citations omitted).  Balancing these factors, habeas relief is not warranted.

First, any error with respect to the admission of Gittens's testimony was so minor that it could not have rendered petitioner's trial fundamentally unfair.  With respect to Blake's testimony, however, this Court, were it presiding over the trial, would not have admitted all of Blake's uncharged crimes testimony.  The evidence went beyond what was necessary to demonstrate the existence of a relationship of confidence between petitioner and Blake in order to explain why petitioner would have admitted Spencer's murder to him. The testimony regarding petitioner's violent history, including that he had shot a prison guard in Jamaica and had ordered someone killed in Texas in 1990, is particularly troubling, and although defense counsel moved for a mistrial during Blake's testimony, he did not seek a curative instruction at that time. (Tr. 649-51.)

Nevertheless, the trial court charged the jury that:

> [T]he evidence of the prior criminal acts between the defendant and Peter Anderson Blake was allowed only for the purpose of showing the relationship which existed between the witness Blake and the defendant, and how it came to be that the defendant made an admission about which Peter Anderson Blake testified.
> The evidence of the prior criminal acts of the defendant allegedly made with Peter Anderson Blake may not be considered by you to determine that the defendant had a propensity to commit the criminal acts.

27

(Tr. 1381.) In addition, the prosecutor in summation told the jurors that the evidence was not to be used to draw the impermissible propensity inference, stating:

> You can't convict this man because his friends are bad.
> You can't convict him because you think he did something bad in
> the past. The only thing is, can you convict him from the evidence
> in this particular case, what he did here?

(Tr. 1336-37.) He further explained in detail that the history of Blake's relationship and criminal activities with petitioner was only presented to demonstrate their bond of trust, and he did not repeat, or in any way emphasize that petitioner had shot a prison guard or ordered a murder. (Tr. 1337-40.)

Moreover, the central issue in the case was the identity of the shooter, and the challenged evidence did not bear directly on that issue. In addition, the evidence of petitioner's identity, including Gittens's accomplice testimony and Blake's testimony regarding petitioner's admission apart from the uncharged crimes evidence, was weighty if not overwhelming. The evidence provided by the nonaccomplice witnesses at the scene of the crime essentially corroborated Gittens's account. As a result, this Court cannot conclude that any erroneously admitted uncharged crimes evidence had a substantial and injurious effect.

## V. Brady Claim

Petitioner's Brady claim is based on exculpatory information allegedly provided by two criminal associates, Maurice Codner and Errol Hendricks, during interviews with Detectives Edward Hendrickson and Brian Quinn. Shortly after petitioner was arrested, on June 4, 1998, the detectives visited Codner and Hendricks at Clinton Correctional Facility where they were serving

28

sentences for an unrelated 1983 Nassau County burglary and homicide they committed with petitioner. The detectives were seeking additional information about both Gittens, who had not yet been arrested, and petitioner.

In an affidavit dated November 22, 1999, and again at the <u>Brady</u> hearing on June 23, 2003, Codner stated that he told the detectives that he was at a nearby store on the night of Spencer's murder and that he knew that petitioner was not the shooter. He also said that he spoke to police at the scene, but that he gave them a false Spanish name. Hendrickson and Quinn nevertheless offered various incentives—including a sentence reduction—in exchange for testimony against petitioner. Hendricks submitted an affidavit, dated January 28, 2003, and testified at the hearing that he told the detectives that he did not know petitioner and was not in the country in 1981. Hendricks also claimed that the detectives offered him a sentence reduction in exchange for testimony against petitioner.

Codner further testified at the <u>Brady</u> hearing that after he learned through a friend that petitioner had been imprisoned, he asked the friend to deliver a letter to petitioner in which he offered to testify. The friend died shortly thereafter, and Codner did not know whether the letter had been delivered. Later that year, on November 22, 1999, Codner prepared his affidavit and sent it to his daughter in Florida. On cross-examination at the <u>Brady</u> hearing, Codner admitted that he and petitioner were together at Greenhaven Correctional Facility in January 2000 and discussed petitioner's case. During that time, petitioner's wife and sister-in-law also visited with Codner and discussed the case with him. Hendricks prepared his affidavit after Codner wrote to him in December of 2002.

Quinn and Hendrickson testified that Codner provided no information about the Spencer

murder and did not tell them he had been present at the scene. Hendrickson also testified that he had read the case folder, and none of the reports indicated that Codner or someone with a Spanish name was a witness. Codner told the detectives that he knew petitioner (H. 183, 293); Hedricks did not. (H. 188, 301.) Both detectives testified that Codner and Hendricks essentially told them to "go fuck [them]selves." (H. 262, 368.) Quinn did not take any notes during the interviews. The notes Hendrickson took were included in the District Attorney's case folder and were introduced in evidence at the hearing.

In a decision and order dated August 22, 2003, the state court rejected petitioner's <u>Brady</u> claim on the ground that he "presented no credible evidence to support the claim that <u>Brady</u> material was withheld." <u>People v. McCarthy</u>, No. 1959/98 (N.Y. Sup. Ct. Sept. 3, 2003) (Memorandum and Order on Motion to Vacate). The court concluded that Hendricks's hearing testimony was irrelevant to any potential <u>Brady</u> violation because he was not in the United States in 1981 and did not know petitioner. <u>Id.</u> With respect to Codner, the court found his testimony "patently incredible, unworthy of belief and lacking any indicia of reliability." <u>Id.</u> The court specifically noted that his claim that he was present the night of Spencer's shooting and spoke to detectives under an alias "transcends belief." <u>Id.</u> The court credited the testimony of Detectives Quinn and Henderson, finding that their version of the interview with Codner "had the force and flavor of credibility and reliability." <u>Id.</u>

Clearly, Codner had ample opportunity to learn sufficient facts about petitioner's case to fabricate his story, and petitioner has not demonstrated any basis for rejecting the trial court's credibility assessments. Thus, the state court's rejection of petitioner's <u>Brady</u> claim was not based on an "unreasonable determination of the facts in light of the evidence presented," 28

U.S.C. § 2254(d)(2).

## VI. Right to Present a Defense

Petitioner also charges that he was deprived of his right to present a defense based on the trial court's preclusion of a 1998 police memorandum indicating that petitioner's finger prints did *not* match any of the latent prints lifted from the cars at the scene.

As defense counsel stated on the record outside the presence of the jury, the May 14, 1998 police memorandum in question, bearing the heading "From: Detective duty Captain. Queens, To: Chief of Detectives, Subject:113th PRECINCT HOMICIDE #33/81," (People's Doc. No. 332), was prepared by Captain Bernard Gillespie, based on information he received over the telephone from another detective. (Tr. 935-37.) Counsel told the court that Gillespie thought that Detective Quinn had been the "voice on the other end of the phone." (Tr. 937.) According to the chronology in the memorandum, on June 16, 1993, based on an informant's tip, petitioner's prints from 1983 were compared to those from the Spencer murder scene, but there was "No Hit." (People's Doc. No. 332.) On March 6, 1996, however, as indicated in the memorandum, prints taken from petitioner at the time of a 1995 arrest were checked against the prints from the scene and there was a "Hit," and the possibility that petitioner had used Krazy Glue on his fingers in 1983 was noted. (Id.)

At trial, the prosecution called Detective Ronald Alongis from the latent fingerprint unit of the New York City Police Department. Alongis had been assigned to the unit for thirteen years. He testified that he compared four sets of petitioner's fingerprints—from March 14, 1983, January 12, 1995, May 13, 1998, and May 14, 1998—with the latent fingerprints from the

31

exterior of the passenger window of the car that petitioner and Gittens arrived in on the night of Spencer's murder. (Tr. 847-48.) Each matched. (Tr. 848.)

On cross, defense counsel asked whether Alongis knew that petitioner's March 14, 1983 fingerprints previously had been compared to those from the car window and had not matched. The prosecutor objected, and his objection was sustained. At a side-bar, the trial court ruled that the 1998 police memorandum could be shown to Alongis, and Alongis could be asked whether the memorandum changed his opinion as to the positive fingerprint identification. The court also directed that Gillespie be made available for the defense to call. (Tr. 859.) On cross, defense counsel showed Alongis the memorandum, and Alongis testified that it did not affect his opinion. (Tr. 878-79.)

During a recess, the prosecution produced Gillespie in court. (Tr. 935.) Defense counsel then made an application to call both Gillespie and Quinn to the stand after the prosecution rested. (Tr. 938.) The application was granted. (Tr. 938.) The prosecution, however, objected to the admission of the 1998 police memorandum itself on the ground that it was "unusual" and did not constitute a business record. (Tr. 939.) The prosecution further explained that, based upon conversations with Gillespie, the negative result in 1993 could have been based on a mistaken comparison of petitioner's brother's fingerprints. (Tr. 941.) The court ruled that Gillespie could be questioned about the memorandum and the prosecution could explore the possible explanations for the initial "No Hit" on cross. (Tr. 943-44.)

The court reiterated these rulings at the close of the prosecution's case and clarified that if the defense called Detective Quinn, the prosecution would be allowed to question him on cross-examination about the possibility that he had mistaken petitioner's brother's prints for

32

petitioner's. (Tr. 1180-85.) The court specifically indicated that Gillespie would be allowed to testify whether he was told that there was a "No Hit" on June 16, 1993, and a "Hit" on March 6, 1996, (Tr. 1185), and that such testimony would be admitted as inconsistent with the testimony of Alongis and not for the truth of the matter. (Tr. 1186.) Defense counsel indicated that he would not call Quinn. (Tr. 1188.) Ultimately, after conferring with petitioner, counsel decided to rest without calling Gillespie. (Tr. 1243.)

Petitioner first argues that defense counsel laid the required foundation for admission of the memorandum and that it was error for the trial court to preclude it. Section 4518(a) of the New York Civil Practice Law and Rules provides a hearsay exception for business records if "(1) the entrant of those facts was the witness, or (2) the person giving the entrant the information was under a business duty to relate the facts to the entrant." Lynn v. Bliden, 443 F.3d 238, 252 (2d Cir. 2006) (internal quotation and citation omitted), cert. denied, 549 U.S. 1257 (2007). Based on this Court's review of the record, however, it appears that the necessary foundation was not laid. As defense counsel disclosed to the court outside the jury's presence, Gillespie had been briefed on the matter and prepared the memorandum based upon conversations he had with detectives at the 113th Precinct. (Tr. 936-37.) According to counsel, Gillespie believed that Detective Quinn was the "voice[] on the other end of the phone" that gave him the information, but while Quinn confirmed that he had briefed Gillespie on the facts and circumstances, he had "no specific recollection of stating those facts." (Tr. 936-37.)

Petitioner further contends that even if the foundational requirements for admission were not met, the trial court's decision to preclude the memorandum deprived him of his right to present a defense. The right to present a defense is one of the "minimum essentials of a fair

33

trial." Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)); see also Crane v. Kentucky, 476 U.S. 683, 690 (1986) (recognizing that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense") (internal quotation and citation omitted). Nevertheless, "[t]he criminal defendant 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Jimenez v. Walker, 458 F.3d 130, 147 (2d Cir. 2006) (quoting Chambers, 410 U.S. at 302.) "Restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process' . . . and are not 'arbitrary or disproportionate' to the purposes they are designed to serve." United States v. Almonte, 956 F.2d 27, 30 (2d Cir.1992) (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987) (internal citation omitted)).

Although the trial court's rationale for precluding admission of the memorandum, and whether such rationale was sound as a matter of state evidentiary law, are not entirely clear, the ruling did not curtail petitioner's opportunity to present a complete defense in any meaningful way. Both Captain Gillespie and Detective Quinn were made available to the defense, and the trial court made clear that defense counsel would be permitted to question Gillespie about the "No Hit." Moreover, the record makes plain that defense counsel, after consulting with petitioner, decided as a strategic matter not to call Gillespie. The Appellate Division's rejection of petitioner's claim was neither contrary to nor an unreasonable application of Supreme Court precedent. Petitioner is not entitled to relief.

VII. Ineffective Assistance of Counsel

Petitioner challenges the effectiveness of trial counsel for failing to request an adverse inference charge with respect to blood samples recovered from the scene. At the time of the murder, using routine blood-typing tests, all of the samples were compared to and found to be consistent with the victim Spencer's blood. DNA tests, however, were not performed, and by the time of trial, the blood samples had been destroyed. Prior to jury selection, defense counsel indicated that, in support of his misidentification defense, he would make an application for an adverse inference charge on the ground that if the blood were still available, DNA testing could definitively show that the blood did not belong to petitioner. At the charging conference, however, defense counsel did not request the instruction.

To demonstrate constitutionally ineffective assistance, petitioner must show (1) that counsel's performance "fell below an objective standard of reasonableness," and (2) that petitioner was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984). To satisfy the prejudice prong, petitioner "must show more than that the unprofessional performance merely 'had some conceivable effect.'" Id. at 693. Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Moreover, because petitioner's claim was raised in state court and rejected on the merits, relief cannot be granted unless the Appellate Division's application of Strickland was objectively unreasonable. Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004) (citing Bell v. Cone, 535 U.S. 685, 699 (2002)). Petitioner cannot meet this standard.

35

Medical examiner Dr. Reiber testified that the blood found at the scene matched the sample taken from Spencer at the time of his autopsy, and defense counsel pointed out in summation that none of petitioner's blood was found at the scene. (Tr. 1019-20; 1021-22; 1266.) There is no reasonable probability that the result of the trial would have been different had counsel requested, and been granted, an adverse inference charge. The Appellate Division's rejection of this claim was entirely reasonable.

VIII. Illegally Imposed Sentence

Petitioner contends that his sentence is illegal on the ground that the sentencing court violated due process by improperly considering uncharged crimes evidence that petitioner was not given the opportunity to challenge. Petitioner raised this claim on appeal, and it was rejected by the Appellate Division on the merits.

The Court has reviewed the sentencing transcript and concludes that the record plainly demonstrates that the sentencing court did not improperly rely on the prosecutor's arguments regarding petitioner's life of crime in imposing sentence. The court recited the crimes of conviction and noted: "I am satisfied that the jury rendered a fair and just verdict. The evidence was there to convict him and I am fully in order with the jury's verdicts on that score." (S. 14.) Moreover, the court specifically rejected the prosecutor's request to impose a consecutive sentence for second-degree criminal possession of a weapon based on the evidence that petitioner possessed a weapon independent of the particular crimes, noting that "that evidence [came] in only as part of the res gestae in order to show that at the time he possessed the weapon on that particular date it was with intent to use it so that has to run concurrent." (S. 14-15.)

Accordingly, there is no basis for relief.

## Conclusion

The application for a writ of habeas corpus is denied, and the petition is dismissed.

Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       September 3ℓ 2009

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge